Nos. 26-2797, 26-2827

# In the United States Court of Appeals For the Eighth Circuit

CONGRESSMAN ROBERT "BOB" ONDER, *et al.*,

*Plaintiffs-Appellees / Cross-Appellants*,

v.

STATE OF MISSOURI, and DENNY HOSKINS, *in his official capacity as Missouri Secretary of State*,

*Defendants*,

RICHARD VON GLAHN, and PEOPLE NOT POLITICIANS,

*Intervenors-Defendants-Appellants / Cross-Appellees*.

Appeal from the U.S. District Court for the Eastern District of Missouri
(4:26-cv-01424-SRC)

## DEFENDANTS' ADDENDUM


**CATHERINE L. HANAWAY**
ATTORNEY GENERAL
815 Olive Street, Ste. #200
St. Louis, Missouri 63101
Tel. (573) 645-9662
Louis.Capozzi@ago.mo.gov

Louis J. Capozzi III, #77756MO
*Solicitor General*
William J. Seidleck, #77794MO
*Principal Deputy Solicitor General*
J. Michael Patton, #76490MO
*Deputy Solicitor General*
Graham D. Miller, #77656MO
*Deputy Solicitor General*

*Counsel for the State of Missouri and Secretary of State Denny Hoskins*

**TABLE OF CONTENTS**


Certificate of Insufficiency of Petition with attached letter from the Attorney General of Missouri ........ Add. 0001

Memorandum and Order entered in Case #4:26-CV-01424-SRC in the United States District Court for the Eastern District of Missouri on September 8, 2026 (Doc. 35) ........ Add. 0009

Order entered in Case #4:26-CV-01424-SRC in the United States District Court for the Eastern District of Missouri on September 9, 2026 (Doc. 49) ........ Add. 0022

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



# STATE OF MISSOURI

## Office of Secretary of State

### CERTIFICATE OF INSUFFICIENCY OF PETITION

STATE OF MISSOURI
ss.
SECRETARY OF STATE

I, Denny L. Hoskins, Secretary of State of Missouri, do hereby certify that my office has examined for compliance with the Missouri Constitution and Chapter 116, RSMo, Referendum Petition 2026-R004 submitted by Richard Von Glahn and People Not Politicians. I find the referendum petition is insufficient under the Missouri Constitution because the Missouri Constitution does not authorize a referendum on congressional redistricting plans passed by the General Assembly. The grounds for insufficiency are more fully articulated in the attached opinion by Missouri Attorney General Catherine Hanaway, which is incorporated by reference into this certificate. For the reasons more fully discussed in the attached opinion, Referendum Petition 2026-R004 shall not be placed on the ballot at the November 3, 2026 General Election.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix the seal of my office in the City of Jefferson, State of Missouri, on this 4th day of August 2026.




Denny Hoskins

*Secretary of State*

Comm. 27 (02/2018)

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



ATTORNEY GENERAL OF MISSOURI
CATHERINE L. HANAWAY

August 4, 2026

Honorable Denny Hoskins, CPA
Missouri Secretary of State
James C. Kirkpatrick State Information Center
600 West Main Street
Jefferson City, MO 65101

Dear Secretary Hoskins:

To assist in your determination about the sufficiency of People Not Politicians's ("PNP") referendum petition, you asked whether the Missouri Constitution permits referenda of congressional maps. You also asked whether the U.S. Constitution allows a referendum petition to void a congressional map until the referendum vote. The answer, to both questions, is "no."

Especially when read to avoid conflicts with the U.S. Constitution, the Missouri Constitution does not allow referenda against congressional redistricting plans. Also, allowing a small minority of Missouri voters to void a duly enacted congressional map—before a majority vote disapproving a map—would violate the U.S. Constitution. Federal law also requires Missouri to use the House Bill 1 ("HB 1") map during the November 2026 General Election.

I.

PNP's referendum petition challenging HB 1 is insufficient because the Missouri Constitution does not authorize referenda on congressional maps. In order to authorize such referenda, the Missouri Constitution would need to speak through a clear statement divesting the legislature of its authority under the U.S. Constitution's Election Clause. But the Missouri Constitution includes no such clear statement. *See* Mo. Const. art. III, §§ 49, 52(a), 52(b).

A.

The Elections Clause of the U.S. Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof." U.S. Const. art. I, § 4 (emphasis

SC101805 Appeal Document Number 27 Page 5

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



added). Thus, U.S. Constitution seems to prohibit divesting the General Assembly of its federal redistricting authority. *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 824–27 (2015) (Roberts, C.J., dissenting). If the Missouri Constitution permitted a referendum on congressional redistricting plans passed by the General Assembly, the Missouri Constitution would likely be preempted by the U.S. Constitution on that point.

However, I need not reach that question because the Missouri Constitution itself cannot be read to authorize a referendum on congressional redistricting plans passed by the General Assembly. The U.S. Constitution informs this analysis. Federal law makes clear that the Missouri Constitution cannot be interpreted to strip the General Assembly of its authority over redistricting absent a clear statement. *See United States v. Gradwell*, 243 U.S. 476, 485 (1917).

Courts have long looked for a clear statement before finding a state legislature's redistricting authority abrogated under the Elections Clause. For example, if Congress wishes to displace state legislative authority, it must "do[] so by positive and clear statutes." *Gradwell*, 243 U.S. at 485. If Congress—the body with textual authority to override state legislatures under the Elections Clause—must act with clear statements, then so too must other actors. The purpose of a clear statement rule is to ensure lawmakers made the intentional choice to depart from the default rules set by the U.S. Constitution. *See Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991). If Missouri is going to make the radical choice to subject congressional redistricting plans to referenda, there must be evidence that Missourians *knowingly* made this choice. It is not enough to point to broad, vague language that might *accidentally* depart from the U.S. Constitution's design.

The U.S. Constitution's framers made a deliberate choice to vest redistricting power in state legislatures. The vagaries of broad language in state law cannot transfer that power in ways that the framers of state law did not intend.

B.

Although the Elections Clause requires a clear statement to divest the General Assembly of its redistricting authority, no such clear statement exists in the Missouri Constitution. "Article III, section 45 is the only provision of the Missouri Constitution directly addressing congressional redistricting." *Luther v. Hoskins*, 730 S.W.3d 567, 571 (Mo. banc 2026). And Article III, Section 45 contemplates only that "the *general assembly* shall by law divide the state into [congressional] districts." Mo. Const. art. III, § 45 (emphasis added). Article III, Section 45 makes no mention of redistricting by initiative or referendum. The Missouri Constitution also contains three referendum provisions, Mo. Const. art. III, §§ 49, 52(a), 52(b), and not one of these provisions mentions congressional redistricting.



Appellate Case: 26-2827 Page: 5 Date Filed: 09/15/2026 Entry ID: 5684061

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



The lack of a clear statement is illustrated by the statutory procedures that the General Assembly enacted in Chapter 116, RSMo. As the Missouri Supreme Court has recognized, Chapter 116 is the General Assembly's "framework for exercising the right of referendum" in Missouri. *No Bans on Choice v. Ashcroft*, 638 S.W.3d 484, 487 (Mo. banc 2022). But Chapter 116 is not designed for referenda on congressional maps—which reinforces the lack of a clear statement in the Missouri Constitution. This is observed in at least three ways.

*First*, Chapter 116 limits a referendum's summary statement in a manner that makes it impossible to meaningfully apprise voters about the referendum's effect. "Electoral districting is a most difficult subject for legislatures," *Miller v. Johnson*, 515 U.S. 900, 915 (1995), and it involves "a number of sensitive considerations" that are extremely complex, *Pearson v. Koster*, 359 S.W.3d 35, 39 (Mo. banc 2012). Chapter 116, however, requires referendum summary statements to contain just 50 words, § 116.334, RSMo, and there is no provision for photographs to accompany summary statements, *id.* Thus, Chapter 116 is obviously not designed for referenda on congressional maps. Indeed, under Chapter 116, many voters would vote on competing congressional maps without even viewing the maps themselves. The fifty-word limit would also produce impossibly vague summary statements—as seen in the summary statement that the Western District Court of Appeals recently approved for PNP's referendum here:

> Do the people of the state of Missouri approve the act of the General Assembly entitled "House Bill No. 1 (2025 Second Extraordinary Session)," which repeals Missouri's existing congressional plan, and replaces it with new congressional boundaries that keep more counties intact?

*People Not Politicians v. Hoskins*, 736 S.W.3d 518, 535 (Mo. App. W.D. 2026). No voter can make an adequately informed decision based on so little language.

*Second*, Chapter 116's timeline for the review of referendum petitions makes little sense in the context of a congressional map. Chapter 116 dictates that the Secretary must complete review of a referendum petition for sufficiency or insufficiency no later than "the thirteenth Tuesday prior to the general election." § 116.150.3, RSMo. But that deadline is on the same day as primary day for congressional candidates in Missouri. § 115.121.1–2, RSMo. If the General Assembly believed that referenda could apply to congressional maps, it would not set the deadline for certification under Chapter 116 on the same day as primary day.

*Third*, the suspension of legislation upon the filing of a referendum petition makes no sense in the context of congressional redistricting. The General Assembly must redistrict Missouri's congressional map at least every ten years. Mo. Const. art. III, § 45. The prior decade's map is discarded, and Article III, Section 45 requires the General Assembly to enact a new map in its place. *Luther*, 730 S.W.3d at 571. A

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



referendum is especially ill-suited to this context. Indeed, if a referendum can freeze duly enacted law on a certification of sufficiency for the referendum, *see Maggard v. State*, 733 S.W.3d 411, 420 (Mo. banc 2026), then that means that Missouri elections might have *no* lawful congressional map. The prior decade's map would be unlawful, Mo. Const. art. III, § 45, and the new congressional map would be suspended through the filing of an adequate referendum petition, *Maggard*, 733 S.W.3d at 420. Neither the framers of the Missouri Constitution nor the drafters of Chapter 116 ever envisioned this result.

Moreover, if a referendum petition can suspend a congressional map for an election cycle, then Missouri's operative congressional map will *not* be decided according to democratic principles. Rather, each time a congressional map is enacted by the General Assembly, a small, well-funded group with signatures from a small fraction of Missouri's voters could suspend Missouri's congressional map for an entire election. In this age of out-of-state, dark-money donors, one could easily expect this to happen every time the General Assembly passes a congressional map. That is not self-government; it is tyranny of the minority. Neither the Missouri Constitution's framers nor the General Assembly anticipated this bizarre result. That all goes to the lack of a clear statement in Missouri law.

II.

Even without considering the U.S. Constitution's requirements, the Missouri Constitution does not subject congressional redistricting to the referendum. The Missouri Supreme Court has never addressed this question directly. Yet in *Maggard v. State*, the Supreme Court carefully noted that its decision should *not* be read to permit referenda of congressional maps. *See* 733 S.W.3d at 414 n.7.

The Missouri Supreme Court was right to reserve that question: Congressional maps are not subject to the referendum under Sections 49, 52(a), and 52(b) of Article III. If it were otherwise, fulfilling the General Assembly's duties under Article III, Section 45 would be impossible. "Article III, section 45 is the only provision of the Missouri Constitution directly addressing congressional redistricting." *Luther*, 730 S.W.3d at 571. Article III, section 45 provides that after "each census," "the *general assembly shall* by law divide the state into districts corresponding with the number of representatives to which it is entitled." Mo. Const. art. III, § 45 (emphasis added). Fulfilling this obligation would be impossible, however, if all redistricting legislation could be suspended by a mere referendum petition. *Maggard* held that if a referendum petition's "filing is ultimately determined to be sufficient," then the challenged legislation never went into effect under Article III, Section 52(b). 733 S.W.3d at 420. This would have disastrous consequences in the context of a congressional map. And it would be particularly problematic after each decennial census, when the Missouri Constitution nullifies the

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



prior decade's congressional map and *requires* the General Assembly to enact a new map. *See* Mo. Const. art. III, § 45.

Thus, reading the Missouri Constitution's referendum provisions to apply to the congressional-redistricting provision necessarily creates a collision. *Compare* Mo. Const. art. III, § 45, *with* art. III, §§ 49, 52(a), 52(b). In these circumstances, a faithful interpreter of the law must prioritize the specific provision over the more general provision. *See City of Aurora v. Spectra Commc'ns Grp., LLC*, 592 S.W.3d 764, 788 (Mo. banc 2019); Scalia & Garner, *Reading Law* 184–85 (2012) (citing *McCallister v. McCallister*, 809 S.W.2d 423 (Mo. App. S.D. 1991)). Here, the more specific provision is Article III, Section 45.

Additionally, even setting aside the general/specific canon, congressional-redistricting legislation falls under exceptions to referenda outlined in Article III, Section 52(a). That section excepts "laws necessary for the immediate preservation of the public peace, health or safety, and laws making appropriations for the current expenses of the state government, for the maintenance of state institutions and for the support of public schools." Mo. Const. art. III, § 52(a). Congressional redistricting falls under these exceptions. As an example, suffrage is a fundamental state institution, and congressional redistricting is necessary to maintain the suffrage right as populations shift over time. Furthermore, post-census redistricting is not only required by the Missouri Constitution, Mo. Const. art. III, § 45; it is also functionally required by virtue of the U.S. Constitution's "one person, one vote" rule, *Wesberry v. Sanders*, 376 U.S. 1 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964). Thus, redistricting legislation also falls under the exceptions outlined in Article III, § 52(a).

III.

Even if the Missouri Constitution authorizes referenda on congressional maps, the Elections Clause and the Guarantee Clause of the U.S. Constitution would nonetheless require Missouri to implement the HB 1 map for the 2026 election.

The U.S. Constitution's Elections Clause expressly vests redistricting authority in Missouri's General Assembly. U.S. Const. art. I, § 4. And the U.S. Supreme Court has *never* suggested that a small percentage of a state's population can usurp this authority. It is one thing to say that a *majority* of voters can overrule the General Assembly. *See Arizona Indep. Redistricting Comm'n*, 576 U.S. at 819–20. But allowing a small fraction of Missourians to override the General Assembly and force a vote under a different congressional map is profoundly at odds with the Elections Clause. "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," U.S. Const. art. I, § 4, and a small band of citizens cannot rip that power away merely by filing a referendum petition.

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



Holding otherwise would also violate the U.S. Constitution's Guarantee Clause, which provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. The Guarantee Clause is also a mandate for state governments because "[t]he guaranty necessarily implies a duty on the part of the States themselves to provide such a government." *Minor v. Happersett*, 88 U.S. 162, 175 (1874).

There is no mystery about what is a "Republican Form of Government." *See* U.S. Const. art. IV, § 4. "All the States had governments when the Constitution was adopted. In all the people participated to some extent, through their representatives elected in the manner specially provided." *Minor*, 88 U.S. at 175. "Thus we have unmistakable evidence of what was republican in form, within the meaning of that term as employed in the Constitution." *Id.* at 176. The right of the people to enact legislation through elected representatives is bedrock in our Republic.

As to HB 1, Missourians have spoken overwhelmingly. HB1 passed 21 to 11 in the Senate and 90 to 65 in the House of Representatives. *See* Mo. S. Journal, 2d Extra. Sess., 103d Gen. Assembly, 25–26 (Sept. 12, 2025); Mo. H. Journal, 2d Extra. Sess., 103d Gen. Assembly, 37–38 (Sept. 9, 2025). Even if "five percent of the legal voters in each of two-thirds of the congressional districts" signed PNP's referendum petition, Mo. Const. art. III, § 52(a), the Guarantee Clause forbids the State of Missouri from allowing that fraction of five percent to override the People's representatives before a majority vote. Until a majority of Missourians vote against the HB 1 map, the will of the People must remain in effect.

IV.

Finally, throwing out the HB 1 map before the imminent 2026 General Election is impracticable and prohibited by federal law.

Today, Missouri completed its Primary Election for selecting congressional candidates. *See* § 115.121.2, RSMo. The General Election is now thirteen weeks (or 91 days) away. *See* § 115.121.1, RSMo. The 2026 General Election therefore must proceed under the same maps created for the Primary. As just one example, consider the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"). *See* 52 U.S.C. §§ 20301, 20302; §§ 115.900–.936, RSMo (implementing UOCAVA into state election chapter). UOCAVA requires local election authorities to transmit ballots "not later than forty-five days before the election" to military and overseas voters, § 115.914, RSMo; 52 U.S.C. § 20302(a)(8), and prevents the certification of election results for three days after an election, *see* §§ 115.920.1, 115.508, RSMo. These requirements apply to both primary and general elections for congressional seats. § 115.904(1), RSMo. Thus, to satisfy UOCAVA in the event of a newly-ordered primary, there would need to be a minimum 93 days required to rerun the primary and then host a general election. This is greater than the 91 days between August 4

Electronically Filed - COLE CIRCUIT - August 18, 2026 - 10:09 AM



and November 3, 2026. And that is assuming that local election officials could instantly transmit a new congressional map into the Missouri Centralized Voter Registration system; instantly print and test the requisite absentee ballots; and instantly transmit all the necessary absentee ballots to military and overseas voters. These tasks would be impossible.

Missouri also cannot discard the HB 1 map for the November General Election now that the HB 1 map was used for the August Primary Election. Doing so would violate Article I, Section 2 of the U.S. Constitution, which provides: "The House of Representatives shall be composed of Members chosen every second Year *by the People of the several States*, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2 (emphasis added). If Missouri forced hundreds of thousands of Missourians to consider a slate of candidates that they never voted on in the primary, the State would deprive "the People" of the right to choose their representatives under Article I, Section 2. Rather, millions of Missourians would consider a slate of candidates in the General Election that they never considered in the Primary Election.

Thus, even if it is ultimately determined that a referendum on congressional redistricting is constitutionally permissible, the 2026 general election must go forward under the HB 1 map.

V.

PNP's referendum petition is unconstitutional. Additionally, setting aside the petition's unconstitutionality, the U.S. Constitution and federal law require Missouri election officials to enforce House Bill 1 during the November 2026 election. The filing of a referendum petition, signed by only five percent of the State's voters, cannot displace the will of the people.

Very truly yours,

Catherine L. Hanaway

CATHERINE L. HANAWAY
Missouri Attorney General

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CONGRESSMAN ROBERT "BOB" ONDER et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 4:26-cv-01424-SRC |
| STATE OF MISSOURI and DENNY HOSKINS, | ) | |
| Defendants. | ) | |

**Memorandum and Order**

On August 4, 2026, Missouri concluded its primary elections using the congressional districts laid out in House Bill 1 ("HB 1"). Missouri voters and candidates for federal office in Missouri request that the Court issue a temporary restraining order enjoining the use of any congressional district map other than HB 1, *see generally* doc. 2. All parties, including Intervenors People Not Politicians and Richard von Glahn, had notice and submitted briefing. Docs. 2, 12, 19–20, 29–30. Having considered the Verified Complaint, the affidavit attached to it, the parties' and intervenors' briefs, and applicable law, the Court grants Plaintiffs' motion for a temporary restraining order.

## I. Facts and Background

The Court treats the following uncontroverted facts, drawn from Plaintiffs' verified complaint, docs. 1, 4, as true for the sake of resolving this motion for a TRO. *See* Fed. R. Civ. P. 65(b)(1)(A). Only a very narrow set of facts bear on the resolution of Plaintiffs' request for a TRO. On September 12, 2025, the Missouri General Assembly passed HB 1, replacing the prior congressional district map enacted in 2022. Doc. 1 ¶¶ 15–16; doc. 12-4 at 11 (The Court cites to

page numbers as assigned by CM/ECF.); doc. 19 at 7. People Not Politicians and its executive director Richard von Glahn (who moved to intervene in this case, doc. 12) circulated a referendum petition seeking to suspend HB 1 until it passed a statewide vote. Doc. 1 ¶ 18; doc. 12 at 1–2. On August 4, 2026, the statutory deadline for doing so, the Missouri Secretary of State Denny Hoskins issued a certificate of insufficiency for the referendum petition. Doc. 1 at ¶¶ 20, 25; *see* Mo. Rev. Stat. § 116.150(3) (setting the statutory deadline to issue a certificate of insufficiency at "5:00 p.m. on the thirteenth Tuesday prior to the general election").

The Complaint alleges, supported by a verified affidavit sworn under penalty of perjury, that Missouri's primary election took place on Augwust 4, 2026. Doc. 1 ¶ 21; doc. 1-1 ¶ 4. The primary election used the HB 1 map. Doc. 1 ¶ 21; doc. 12-1 at 5, 7. Neither Defendants nor Intervenors have disputed those facts; Intervenors' briefing acknowledges that Missouri concluded its congressional primary elections on August 4, 2026. Doc. 12-1 at 7. The Complaint alleges that Plaintiffs Patricia Thomas and Debra Havens would cast votes in a different congressional district under the 2022 map than the one in which they cast their primary-election votes under the HB 1 map. Doc. 1 ¶ 17. The Complaint further alleges that the HB 1 congressional districts in which Plaintiffs Congressman Robert Onder and Richard Brattin won nominations would change. Doc. 1 ¶¶ 2, 4, 37.

On September 3, 2026, the Missouri Supreme Court issued an opinion in *von Glahn v. Hoskins*, determining that, as a matter of state law, the Missouri Constitution authorizes referenda on the General Assembly's adoption of new congressional district maps. *von Glahn v. Hoskins*, --- S.W.3d ---, No. SC101805, at *3 (Mo. Sep. 3, 2026) (en banc). The court enjoined Secretary of State Hoskins from using the HB 1 map for the November general election, retroactively deeming under state law that HB 1 "is not the law and has never been the law." *Id.*

at *13–14, 12 n.8. Because the court concluded that any "claimed federal law violations" had been "waived and abandoned" by the Secretary of State, the court limited its holding to the single state-law issue of whether the Missouri Constitution authorized referendums on congressional redistricting plans. *Id.* at *5 n.5.

On September 4, 2026, Plaintiffs filed a complaint in this court, alleging claims under the Elections Clause; Article I, Section 2 of the U.S. Constitution; and the Equal Protection Clause. Doc. 1 ¶¶ 50–109. Plaintiffs moved for a temporary restraining order and a preliminary injunction and requested a "[TRO] and preliminary injunction hearing as expeditiously as possible." Doc. 2 at 2. Plaintiffs moved to expedite the briefing and hearing schedule, asking the Court to resolve their motion for a TRO and preliminary injunction "as expeditiously as possible." Doc. 3 at 2. Also on September 4, 2026, the Secretary of State filed an Emergency Application for Stay and Administrative Stay Pending Appeal before the Supreme Court, raising the same federal law claims. Emergency Appl. for Stay and Admin. Stay Pending Appeal, *Hoskins v. von Glahn*, No. 26A304 (U.S. Sep. 4, 2026). Justice Kavanaugh denied the application on September 8, 2026. *See Hoskins v. von Glahn*, No. 26A304 (U.S. Sep. 8, 2026). On September 5, Intervenors moved to intervene, requesting oral argument and the opportunity to "participate fully" in any hearings on Plaintiffs' motion for a TRO and preliminary injunction. Doc. 12-1 at 18.

Missouri law sets the deadline for finalizing the general-election ballot at 5:00 p.m. on the eighth Tuesday before the general election. Mo. Rev. Stat. § 115.125(2). The State has set the general election for November 3, 2026, meaning that the deadline for finalizing the ballot is 5:00 p.m. today, September 8. Doc. 1 ¶ 33; doc. 12-1 at 8; doc. 12-4 at 12.

Because no party or intervenor has disputed the facts described above and because many of those facts are matters of public record, the Court accepts the above facts as true for the purpose of this TRO.

**II. Discussion**

Before issuing a TRO, the Court must consider (1) the threat of irreparable harm to the movant (2) the balance between that harm and the injury that granting the injunction would inflict, (3) the movant's probability of success on the merits, and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). No single factor is dispositive, but the probability of success on the merits is the most important. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). The relevant inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. The movant bears the burden of proving the necessity of injunctive relief. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**A. Irreparable harm**

Demonstrating irreparable harm requires showing "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted). The party facing the harm must have "no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Plaintiffs meet that burden here.

Plaintiffs face irreparable harm absent a TRO because many Missouri voters would have to cast their general-election votes for candidates whom they had no role in nominating.

Candidates who had no choice but to campaign and raise money in the HB 1 districts that Missouri's highest election authority presented to them, have spent their funds and campaign efforts in districts that would no longer exist. Using a map other than HB 1's would disenfranchise primary-election voters and undermine the nominations of candidates chosen in the primaries, leading to "certain" and "great" harm, *Novus Franchising, Inc.*, 725 F.3d at 895, not merely "speculative" or "possible" harm, *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (alteration and citation omitted). The primary ballots cannot simply be recounted under the 2022 districts, as the district boundaries and candidates would not be the same for all voters. And the harm could not be more imminent: under state law, the deadline for finalizing the ballot is today, September 8. *See* Mo. Rev. Stat. § 115.125(2).

**B. Balance of Harms**

Conducting state elections in accordance with the Missouri Constitution undoubtedly qualifies as an important interest. But the Eighth Circuit has observed that "there can be little harm to other parties where . . . 'a stay preserves the status quo and promotes confidence in our electoral system.'" *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (quoting *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020)). Preserving the status quo entails using the same map for the general election that Missouri used for its primaries—the HB 1 map. *See* doc. 1 ¶ 21. Whatever harm Defendants, Intervenors, or others might suffer under a TRO pales in comparison to the irreparable harm that Plaintiffs and, palpably notable here, the public would suffer if the Court does not issue a TRO.

### C. Probability of success on the merits

#### i. Elections Clause

Article I, Section 4 of the federal Constitution gives to state legislatures the ability to establish "the Times, Places, and Manner of holding Elections for Senators and Representatives." U.S. Const. art I, § 4, cl. 1. While it recognizes the "need for congressional oversight," the Elections Clause doesn't "disarm States from adopting modes of legislation that place the lead rein in the people's hands." *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 816 (2015). Because the "dictionaries of the founding era . . . capaciously define[d] the word legislature," *Moore v. Harper*, 600 U.S. 1, 25 (2023) (internal quotation marks omitted), "includ[ing] the referendum within state legislative power for the purpose of apportionment" does not offend the Elections Clause, *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916); *see also Hawke v. Smith*, 253 U.S. 221, 230–31 (1920) (describing *Hildebrant*'s holding).

In *Hildebrant*, the Supreme Court considered an Elections-Clause challenge to Ohioans' rejection of new congressional districts by popular referendum. *Hildebrant*, 241 U.S. at 566–67. The Ohio Constitution permitted its voters "to approve or disapprove by popular vote any law enacted by the General Assembly." *Id.* at 566; *see* Ohio Const. Art. II, § 1 (1912) ("[T]he people reserve to themselves the power . . . [to] reject [laws] at the polls on a referendum vote."). The Court held that the referendum, as part of the state's legislative power, did not violate the Elections Clause. *Hildebrant*, 241 U.S. at 569.

Missouri's Constitution grants the people of Missouri the "power to approve or reject by referendum any act of the general assembly." Mo. Const. Art. III, § 49. Interpreting its own Constitution, the Missouri Supreme Court has held that redistricting is "subject . . . to a

referendum as the default" because "redistricting by the General Assembly is a legislative act." *Von Glahn v. Hoskins*, No. SC101805, at *7 (Mo. Sep. 3, 2026) (en banc).

Plaintiffs are not likely to succeed on the merits of their Elections-Clause claim because the referendum is a licit part of the legislative power in Missouri. States may choose to vest parts of the legislative power in bodies other than the General Assembly, and Missouri has so chosen. *See Ariz. State Legis*, 576 U.S. at 813; *Moore*, 600 U.S. at 23; Mo. Const. Art. III, § 49. In turn, states may permit their voters to challenge redistricting maps by referendum without running afoul of the Elections Clause. *See Hildebrant*, 241 at 569.

Plaintiffs argue that a state constitutional provision must, under the Elections Clause, "supply [a] clear, deliberate statement" to "divest its legislature of redistricting authority." Doc. 2-1 at 6 (citing *Ariz. State Legis.*, 576 U.S. at 843 (Roberts, C.J., dissenting)). This argument is unavailing for two reasons.

First, the referendum doesn't *divest* the Missouri legislature of redistricting authority, as the people are part of the Missouri legislature through the referendum process. *See* Mo. Const. Art. III § 49 (locating referendum provision in article on "legislative department"); *von Glahn*, No. SC101805, at *8 ("[T]he referendum and initiative petition power . . . is an essential part of the state's lawmaking process under the Missouri Constitution."). Second, to the extent a clear statement rule applies in the Elections-Clause context, the Missouri Constitution's referendum provision is as clear as the Ohio Constitution's provision upheld in *Hildebrant*—both referendum powers apply to any law of the General Assembly. *Compare* Mo. Const. Art. III, § 49 *with* Ohio Const. Art. II, § 1 (1912); *see Hildebrant*, 241 U.S. at 566.

The Court therefore finds that Plaintiffs are not likely to succeed on the merits of their Elections-Clause claim. Next, the Court turns to Plaintiffs' Article I, Section 2 claim.

**ii. Article I, Section 2**

Article I, Section 2 of the Constitution provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2, cl. 1. The Supreme Court has stated that, "[w]here the state law has made the primary an integral part of the procedure of choice, . . . the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, Section 2." *United States v. Classic*, 313 U.S. 299, 318 (1941).

Missouri law dictates that "all candidates for elective office shall be nominated at a primary election . . . ." Mo. Rev. Stat. § 115.339. Afterwards, "[t]he person receiving the greatest number of votes at a primary election as a party candidate for an office shall be the only candidate of that party for the office at the general election." Mo. Rev. Stat. § 115.343. Using such a structure for elections renders the primary an "integral part of the election process. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 207 (1996) (describing a primary election as "an 'integral part of the election machinery'" when a state "effectively divided its election into two stages, the first consisting of the selection of party candidates and the second being the general election (quoting *Classic*, 313 U.S. at 318)); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 211, 226–27 (1986) (treating primary elections that led to the nomination of a party's candidate as integral parts of the election process). The Eighth Circuit held in 1949 that Missouri's then-existing primary election system—which, like the present system, provided that "no one can be elected to office without receiving nomination at a primary election"—was "an integral part of the general election laws of the state for the election of public officers, including Members of Congress." *Klein v. United States*, 176 F.2d 184, 187 (8th Cir. 1949).

Because voters have already cast their ballots in the primaries, doc. 1 ¶ 21, replacing the applicable map for the general election would disenfranchise voters of their votes in the primary election, in clear violation of Article I, Section 2. Voters reassigned to different district would have cast their votes in vain for candidates now connected to other districts, effectively nullifying their votes.

Intervenors' only rebuttal is that Plaintiffs' Article I, Section 2 claim "rest[s] entirely on the premise that HB 1 was lawfully in effect when the August 4, 2026 primary was conducted." Doc. 12-4 at 18. But Plaintiffs' Article I, Section 2 claim does not depend on the legal status of the HB 1 map. Whether or not HB 1 was the governing law during the primary election, voters—including Plaintiffs—voted in primary elections within the congressional districts drawn by HB 1. *See* doc. 1 at ¶¶ 21–22, 24. And they didn't do so of their own accord. Instead, they did so based on the parameters set by Missouri's highest election authority, the Secretary of State. Mo. Const. Art. IV, § 14.

The Court therefore finds that Plaintiffs have a high probability of success on the merits of their claim under Article I, Section 2.

**iii. Equal Protection Clause**

The Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Included in equal protection is "a citizen['s] . . . right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (collecting cases). And "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963).

The Equal Protection Clause's aegis covers the rights not only of voters but also of candidates: a state cannot "unfairly or unnecessarily burden . . . an individual candidate's equally important interest in the continued availability of political opportunity" because "voters can assert their preferences only through candidates or parties." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). Primary-election procedures, as "'state action within the meaning of the Fourteenth Amendment . . . must be . . . consistent with the Equal Protection Clause." *Bullock v. Carter*, 405 U.S. 134, 140–41 (1972). And when a state "limit[s] the choices available to voters, [it] impairs the voters' ability to express their political preferences," requiring the "[s]tate [to] establish that its classification is necessary to serve a compelling interest." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

Plaintiffs have demonstrated a sufficient likelihood of success on the merits of their Equal Protection Clause claim. In the August primaries, voters have already cast their ballots and candidates already ran using the HB 1 map. Doc. 1 at ¶¶ 21–24. Replacing the HB 1 map after the primary would sort "hundreds of thousands" of voters into different districts and cause candidates to run in districts covering voters to whom those candidates have not campaigned. *Id.* at ¶¶ 36–37. Using any map other than HB 1's for the general election creates two classes of voters: those who happen to stay in their HB 1 congressional districts, and those who do not. Likewise, it divides candidates between those who retain the same electorate, and those who do not. In both situations, those who "do not" are divested of their fundamental electoral rights.

Switching maps now would deprive many Missourians of their equal vote in the primaries and "impair the voters' ability to express their political preferences" by foisting new candidates on them on the eve of the election. *See Socialist Workers Party*, 440 U.S. at 184. Defendants have not offered an interest to establish the necessity of these arbitrary geographic

classifications, nor do they want to. *See generally* doc. 11. So these classifications burden or outright divest the right to vote—"the essence of a democratic society" and "the heart of representative government"—without justification. *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

Like their response to Plaintiffs' Article I, Section 2 claim, Intervenors argue that the Equal-Protection claim presumes the lawfulness of the HB 1 map when the primary occurred. That contention is irrelevant to the Equal-Protection claim as it was to the Article I, Section 2 claim. The primary already happened, and the clock cannot be turned back, so Missouri must honor the equal right to vote of all its eligible voters, regardless of geography.

The Court therefore finds that Plaintiffs have shown a high probability of success on the merits of their Equal-Protection-Clause claim. Because the Court finds an adequate likelihood of success for two out of the three claims, the Court turns to the public's interest in temporary relief.

**D. Public interest**

The public interest favors enjoining the Secretary from using the 2022 map for the general election. Disenfranchising voters across the state and denying them their constitutional right to have their primary votes counted significantly harm the public interest. "[I]t is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds*, *Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc).

On top of that, "[t]he public has an interest in the fair and orderly operation of election[s] . . . ." *Org. for Black Struggle*, 978 F.3d at 609. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 423 (2020) (per curiam) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)); *Merrill v. Milligan*,

142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of application for stays) ("When an election is close at hand, the rules of the road must be clear and settled."); *Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026). In *Purcell v. Gonzalez*, the Supreme Court explained that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls," a risk that grows "[a]s an election draws closer." *Purcell*, 549 U.S. at 4–5.

Admittedly, courts normally invoke the *Purcell* principle to caution against federal-court intervention in the election decisions of state legislatures, and no federal court has ordered the use of the 2022 map. But *Purcell* does not cut against injunctive relief here. This case presents *Purcell* in reverse, but with no less weight. Injunctive relief "may be inequitable if it is issued shortly before an election, when candidates, election officials, and voters have relied on the rules in place at that time." *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring in grant of stay). Issuing a TRO here would preserve, rather than disturb, the election rules that candidates, election officials, and voters have relied on. If anything, the public interest concerns that the *Purcell* principle invokes—avoiding voter confusion, disincentivizing voting, and preserving the fair and orderly operation of elections—support issuing a TRO. Missouri already held its primaries using the HB 1 map. Doc. 1 ¶ 21. Using a different map for the general election would wreak havoc on the fairness and orderliness of Missouri's congressional elections, calling into question the candidacy of those nominated in the primaries and the votes of those who voted in the primaries. Widespread voter confusion would inevitably follow. The public interest factor thus weighs in favor of a TRO.

## III. Conclusion

Accordingly, the Court grants Plaintiffs' [2] motion for a temporary restraining order and enjoins, on federal law grounds, Secretary of State Hoskins—as well as his officers, agents, employees, and attorneys—from implementing, using, publishing, distributing, or mandating the use of any congressional district map other than the HB 1 map for the November 3, 2026 general election. The Court finds that a hearing is not necessary because all parties have participated fully through their briefing, and because all parties agree on the material facts. The Court also denies Plaintiffs' [3] Motion to Expedite as moot.

This order remains in effect for 14 days from the date of issuance. The Court will set a preliminary injunction hearing by separate order. Neither Defendants nor Intervenor Defendants asks the Court to set a bond, and having considered the issue, the Court finds a bond unnecessary on these unique facts and circumstances. *See* Fed. R. Civ. P. 65(c). As provided in Rule 65(d)(2), this temporary restraining order binds "only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."

So ordered this 8th day of September 2026.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CONGRESSMAN ROBERT "BOB" ONDER et al.,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF MISSOURI and DENNY HOSKINS,<br><br>Defendants. | ) | Case No. 4:26-cv-01424-SRC |

**Order**

On September 8, 2026, Intervenor-Defendants filed an Emergency Application for Stay, doc. 38, asking this Court to stay its temporary restraining order issued earlier that day, doc. 35. For the reasons discussed below, the Court denies Intervenor-Defendants' stay application.

## I. Discussion

### A. 28 U.S.C. § 2284

28 U.S.C. Section 2284(a) does not apply. The statute requires the appointment of a three-judge panel "when an action is filed challenging the constitutionality *of the apportionment of congressional districts*," *id.* (emphasis added), but Plaintiffs do not contest the constitutionality of the underlying apportionment in the prior congressional district map from 2022, *see generally* doc. 1. Instead, they challenge only that the Secretary of State can, consistent with the United States Constitution, *switch congressional district maps* between the primary and general elections. Doc. 1 at ¶¶ 50–109.

Even if Section 2284(a) applied, the statute explicitly allows a single judge to enter a temporary restraining order. 28 U.S.C. § 2284(b)(3) ("A single judge . . . may grant a temporary

restraining order on a specific finding, based on evidence submitted, that specified irreparable damage will result if the order is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction."). The Court's TRO remains in effect for fourteen days from issuance, and the Court may extend it. *See* doc. 35 at 13 (The Court cites to page numbers as assigned by CM/ECF.); Fed. R. Civ. P. 65(b)(2) (A TRO "expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period . . . ."). Section 2284 thus does not bar the relief that the Court issued.

**B. *Rooker-Feldman* doctrine**

"*Rooker-Feldman* bars suits in federal district court that 'see[k] what in substance would be appellate review of [a] state judgment." *T.M. v. Univ. of Md. Med. Sys. Corp.*, 146 S. Ct. 1739, 1749 (2026) (alterations in original) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994)). The doctrine "is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The *Rooker-Feldman* doctrine does not apply here. First, Plaintiffs' Complaint raised issues distinct from that which the Supreme Court of Missouri addressed. The Supreme Court of Missouri expressly limited its decision to a single issue of state law—whether the Missouri Constitution authorizes referenda on the adoption of new congressional district maps. *See von Glahn v. Hoskins*, No. SC101805, 2026 WL 2628846, at *2 n.5 (Mo. Sep. 3, 2026) (en banc). In sharp contrast, Plaintiffs' Complaint in this Court raised only federal law claims. Doc. 1 at

¶¶ 50–109. Plaintiffs therefore did not ask this Court to "review and reject[]" the judgment of the Supreme Court of Missouri. *Exxon Mobil Corp.*, 544 U.S. at 284.

Second, Plaintiffs are not "state-court losers complaining of injuries caused by state-court judgments." *Id.* The Plaintiffs here were not parties to and did not participate in the state case, so the *Rooker-Feldman* doctrine does not apply to them. Intervenor-Defendants counter that "evidence of collusion may overcome" the "state-court losers" limitation, citing speculative dicta in a footnote of a bankruptcy-appellate-panel case that itself cited no supporting authority. *See* doc. 38 at 2–3 (citing *In re Skyline Woods Country Club, LLC*, 431 B.R. 830, 837 n.23 (B.A.P. 8th Cir. 2010)). Even if it were a holding, which it isn't, it doesn't bind this court. *See In re Watkins*, 461 B.R. 57, 59 n.2 (Bankr. W.D. Mo. 2011) ("[Bankruptcy Appellate Panel] opinions are not binding on the Bankruptcy or District Courts . . . ."); *In re Pepmeyer*, 273 B.R. 782, 785 (N.D. Iowa 2002).

### C. Abstention doctrines

#### 1. *Younger*

*Younger* abstention does not require that the Court stay this case. First, as a general rule, "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (citation omitted). *Younger* abstention applies to bar federal relief in only "three 'exceptional' categories," sometimes called *NOPSI* categories after *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) ("*NOPSI*"): (1) "federal-court adjudication of the constitutionality" of a state criminal statute "pending state criminal prosecution"; (2) federal-court adjudication pending a state-initiated civil proceeding 'in aid of and closely related to [the State's] criminal statutes'"; and (3) federal-court adjudication "interfering with

pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions," *Sprint Commc'ns,* 571 U.S. at 77–78 (alterations in original) (first citing *Younger v. Harris*, 401 U.S. 37, 53–54 (1971); then quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975); and then quoting *NOPSI*, 491 U.S. at 368).

If the case falls into a *NOPSI* category, courts then address three additional factors, called the *Middlesex* factors: whether there is "(1) an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides the federal plaintiff adequate opportunity to raise federal challenges." *Wassef v. Tibben*, 68 F.4th 1083, 1087 (8th Cir. 2023) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–35 (1982)). Even if the case falls into a *NOPSI* category and meets the *Middlesex* factors, a court may still exercise jurisdiction where an "extraordinary circumstance" counsels against abstention. *Id.* (quoting *Middlesex Cnty. Ethics. Comm.*, 457 U.S. at 435).

This case neither falls into a *NOPSI* category nor meets the *Middlesex* factors, so abstention is inappropriate. First, federal-court adjudication of federal constitutional claims after the issuance of a state-court's judgment on state-law claims doesn't fall into any of the three *NOPSI* categories. Intervenor-Defendants don't explain which category this case falls into, instead skipping straight to the *Middlesex* factors. *See* doc. 33 at 13; doc. 38 at 3. But even if this case fell into a *NOPSI* category, not all *Middlesex* factors counsel in favor of abstention.

To the contrary, two of the three *Middlesex* factors counsel against abstaining here. Von Glahn and People Not Politicians had already exhausted their state-court remedies, and the Supreme Court of Missouri had already issued its judgment and order with an express bar on any post-disposition motions, when Plaintiffs here filed suit. *Compare von Glahn*, 2026 WL 2628846, at *7 (filed on September 3 and further mandating "[n]o Rule 84.17 motions are

permitted"), *with* doc. 1; *see Huffman*, 420 U.S. at 609 (holding that *Younger* abstention applies where "a losing litigant has not exhausted his state appellate remedies"). Thus, the Supreme Court of Missouri having fully and finally decided the case, no state-court proceedings were ongoing or pending. *See Pending*, *Black's Law Dictionary* (12th ed. 2024) ("Remaining undecided; awaiting decision[.]"); *see also von Glahn*, 2026 WL 2628846, at *7 (entering judgment); *von Glahn v. Hoskins*, No. SC101805 (Sep. 4, 2026) (denying motion for stay pending appeal).

Intervenor-Defendants rely on the then-pending request for Supreme Court review to show the state case was ongoing, but Intervenor-Defendants cite caselaw supporting that "state court proceedings were ongoing *until*" the state supreme court renders its judgment. *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1251 (8th Cir. 2012) (emphasis added). And it's hard to find that a state proceeding is "pending" or "ongoing" when Intervenor-Defendants also argue that the *Rooker-Feldman* doctrine, which applies to "state-court losers complaining" about "state-court judgments rendered before the district court proceedings commenced," bars this action. *Exxon Mobil Corp.*, 544 U.S. at 284; *see* doc. 33 at 10–11; doc. 38 at 2–3. At bottom, without an ongoing state proceeding, *Younger* abstention is inappropriate.

Even if state proceedings were ongoing, Plaintiffs here did not have the opportunity to raise federal challenges in the state court, as they were not parties to that case. *See* docket, *von Glahn v. Hoskins*, No. SC101805 (Mo. 2026). And Plaintiffs' legal positions and interests are not "so intertwined" with the state-court parties "that [] *Younger* abstention [is] warranted." *Womens Servs., P.C. v. Douglas*, 653 F.2d 355, 358, 359 (8th Cir. 1981) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928–29 (1975)) (finding *Younger* abstention inappropriate where federal-court plaintiff and state-court defendant differed in identity, control, legal theories, and legal interests).

Because the prerequisites to apply *Younger* don't converge here, the Court must live up to its "virtually unflagging obligation . . . to exercise the jurisdiction given" to it. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

### 2. *Colorado River*

"*Colorado River* [abstention] permits federal courts to decline to exercise jurisdiction over cases where 'parallel' state court litigation is pending . . . ." *Spectra Commc'ns Grp., LLC v. City of Cameron*, 806 F.3d 1113, 1121 (8th Cir. 2015). A state-court case is "parallel" when it's "substantial[ly] likel[y] that the state proceedings will fully dispose of the claims presented in the federal court." *Id.* (quoting *Cottrell v. Duke*, 737 F.3d 1238, 1245 (8th Cir. 2013)). As described above, the judgment of the Supreme Court of Missouri, by its own terms, resolved only a state-law issue, and Plaintiffs' Complaint here raises only federal-law claims. So no "parallel" state-court case exists in which "the state proceedings will fully dispose of the claims presented in federal court." *Spectra Commc'ns Grp.*, 806 F.3d at 1121. Had the state court decided federal issues, we might be in a different situation; it didn't, so we're not. *Colorado River* abstention does not apply.

## D. Anti-Injunction Act

The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. But Plaintiffs were not part of the state-court proceedings, and the Supreme Court has made clear that the Anti-Injunction Act does not bar federal courts from granting injunctive relief against executive officials requested by "strangers to [a] state court proceeding" that issued an injunction. *Imperial Cnty. v. Munoz*, 449 U.S. 54, 59 (1980) (quoting *Hale v. Bimco Trading,*

*Inc.*, 306 U.S. 375, 378 (1939)). Otherwise, the state-court injunction would "[bind] the independent suitor in the federal court as though he were a party to the litigation in state court," a proposition the Supreme Court rejected. *Hale*, 306 U.S. at 378. It is beyond cavil that Plaintiffs did not participate in the state-court proceeding. They sue now in their capacities as primary voters and candidates—capacities that have no overlap with the state-court parties. Doc. 1 at ¶¶ 1–9. They are thus "strangers to the state court proceeding" and cannot be "bound 'as though [they] were part[ies] to the litigation in the state court'" by the state court's injunction. *Hale*, 306 U.S. at 378. The Anti-Injunction Act does not bar the relief this Court granted.

**E. Public interest and balance of harms**

Notably, the Eighth Circuit Court of Appeals has denied Intervenor-Defendants' motion for a stay pending appeal because that court "either lack[s] jurisdiction over the appeal or, based on the briefing . . . so far, the stay factors have not been met. *Onder v. Missouri*, No. 26-2797 (8th Cir. Sep. 9, 2026); *see Nken v. Holder*, 556 U.S. 418, 425–26 (2009); *see also In re Rutledge*, 956 F.3d 1018, 1026 (8th Cir. 2020) (explaining that the Eighth Circuit "ordinarily lack[s] jurisdiction to hear an interlocutory appeal from the district court's grant . . . of a TRO")."

The Court continues to adhere to the balance-of-harms and public-interest analysis from its September 8 Order granting the TRO. Doc. 35 at 5, 11–12. Indeed, staying the TRO now would fly in the face of the *Purcell* interests that the Court discussed in its prior order by further heightening voter confusion, the disincentive to vote, and the chaos into which Missouri's electoral process was already cast before this Court's prior order. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam).

## II. Conclusion

Accordingly, the Court denies Intervenor-Defendants' [38] Emergency Application for Stay.

So ordered this 9th day of September 2026.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE